UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| SERJIO A. ALTAMIRANO, | ) | |
| Petitioner, | ) ) | CASE NO. C07-1748-MJP-JPD |
| v. | ) ) | |
| TIM WENGLER, | ) ) | REPORT & RECOMMENDATION |
| Respondent. | ) ) | |

## INTRODUCTION

Petitioner Serjio Altamirano is a Washington state prisoner who is currently serving the second of two consecutive sentences that were imposed following his convictions in 1983 for a two-day series of crimes that included robbery, burglary, murder, and theft. On August 7, 2006, the Indeterminate Sentence Review Board ("ISRB" or "Board"), denied petitioner's application for parole and added 90 months to his minimum term of imprisonment. Petitioner, represented by counsel, challenges that decision through the instant petition for a writ of habeas corpus. Respondent has filed an answer and a supplemental answer, to which petitioner has filed responses. After considering the parties' submissions and the balance of the record, the Court recommends that the petition be denied with prejudice.

## BACKGROUND

The facts underlying petitioner's state court convictions were summarized in a previous federal case as follows:

REPORT & RECOMMENDATION
PAGE 1

On August 20, 1982, defendants Efren Gamboa and Serjio Altamirano left Modesto, California, with female companions, Amalia Sanchez-Garcia and Lorena Alvidres. They planned to drive to Wenatchee, Washington, in a 1969 blue Plymouth to find work. Defendants Gamboa and Altamirano as well as Amalia Sanchez-Garcia were Mexican citizens who had illegally entered this country. Lorena Alvidres was a 16 year old United States citizen living with her mother and sisters in Modesto.

The four individuals drove to Washington but could not find work in the Wenatchee area. They spent their nights camping near rivers and eventually made their way to Snohomish County. Money was running out and gas had to be siphoned from parked vehicles.

Lorena Alvidres testified that during the early morning hours of August 28, 1982, Efren Gamboa broke into a pick-up truck and stole a shotgun and shotgun shells. This gun was eventually used in the commission of the robbery and murder. It is believed that the gun was stolen from Ivan Firestone of Gold Bar, Washington, who reported the theft of a Snake Charmer 410 guage [sic] shotgun out of his pick-up truck on August 28, 1982.

Later that same morning the defendants drove to a freeway rest area located south of Everett, Washington. The vehicle was parked at the rest area and defendants told their female companions that they were leaving to get some money. Efren Gamboa hid the shotgun under his clothing and instructed the females to remain at the car. Lorena Alvidres observed the defendants jump over a fence, heading away from the rest area.

Defendants proceeded through some woods to the residence of Lorelei Hanick, located a short distance from the freeway rest area. Lorelei Hanick was present with her fiancé, Robert Christenson. Defendants approached the residence from the back yard and forced the victims into the house at gunpoint. The victims were then forced to lay down on the floor where they were bound, gagged, and eventually blindfolded. While on the floor the victims were repeatedly poked and threatened with the shotgun. Mr. Christenson was struck in the back on a couple of occasions.

For approximately twenty minutes, defendants searched through the house, demanding to know the location of money, valuables, and guns. The victims remained tied up on the floor. When the search was completed, the victims were thrown into a closet while still bound.

A short time after defendants left the Hanick residence, the victims freed themselves and contacted the Everett Police Department. A number of items of personal property were discovered missing, including jewelry, money, and food items. A search dog was brought to the scene and tracked the scent of the defendants from the back of the Hanick residence in a direction towards the freeway rest area.

Lorena Alvidres testified that the defendants had returned to the rest area approximately one hour after they had left, carrying the property stolen from the Hanick residence as well as the shotgun. They left the rest area and drove to a

REPORT & RECOMMENDATION
PAGE 2

location near milepost 39, just off Stevens Pass highway, near Index, Washington. Defendants stopped at this location due to mechanical difficulties with their car. A river was located nearby where the four individuals camped for the night.

The next day, August 29, 1982, Sherry Yumil saw the 1969 Plymouth parked on her property and made contact with the defendants. She ordered everyone off her property but was told the vehicle would not run because of a dead battery. Ms. Yumil and two friends gave assistance and tried to jump-start the vehicle but it would not start. The vehicle was later discovered to be abandoned at the same location on Ms. Yumil's property. Property taken from the Hanick residence was also found at that location.

Lorena Alvidres testified that following the confrontation with Sherry Yumil and the failure to start the car, the vehicle was abandoned. They took their possessions, which included the shotgun and property stolen from the Hanick residence, and walked upstream along the riverbank, looking for a place to stay. They eventually found a shed which was later determined to be approximately one-half mile upstream from the Yumil property.

Once at the shed, defendants Gamboa and Altamirano talked about getting a car for transportation. A short time later they heard a car park a short distance away and walked off in that direction, taking the shotgun with them. The females were left behind at the shed. A few minutes later, Lorena Alvidres heard a shot coming from the directions defendants had taken. She could not see what happened due to the trees and bushes surrounding the shed. Defendants returned to the shed a few minutes after the shot was heard and hurried everyone into a tan Plymouth station wagon. As they left the area in the station wagon, Lorena Alvidres was told by defendants that the station wagon was taken from a man in his thirties who was there to go fishing. She was also told that they scared the man but did not hurt him.

The body of William Persons was discovered the next day hidden in some brush near the river approximately fifty yards away from the shed. William Persons had been shot in the back of the neck with a small guage [sic] shotgun. According to the pathologist, the shotgun was less than six inches away from William Person's neck when the shot was fired. His body had been stripped of belongings and identification.

William Persons had not been seen since August 29, 1982, at approximately six o'clock p.m. when he left his place of employment in Seattle, Washington. William Persons had left work early to go fishing before returning home and was driving a tan Plymouth station wagon. The area near the shed where the body was discovered was a favorite fishing location of William Persons.

After the shooting death of William Persons, which occurred during the evening hours of August 29, 1982, defendants left the State of Washington, drove through Oregon, and arrived in Yreka, California, during the morning hours of August 30, 1982. According to Lorena Alvidres, the shotgun was discarded somewhere near the California/Oregon border. While in Yreka at approximately 9:30 a.m., defendants were involved in assault and theft of purse from Rebecca

REPORT & RECOMMENDATION
PAGE 3

> Rowland . . . . Miss Rowland supplied a description of the defendants and their vehicle to the police. This information was relayed to the California highway patrol.
>
> At approximately 10:45 a.m. a California highway patrol unit spotted the defendants' vehicle southbound on I-5. A high speed chase resulted that lasted approximately 45 minutes and involved numerous California highway patrol units. Speeds approaching 100 miles per hour were obtained during the pursuit. While the pursuit was taking place, items were thrown out of the vehicle and onto the freeway. The officers involved in the pursuit attempted to gather as many of the items thrown out of the vehicle as possible. Many of these items were later identified by Lorelei Hanick, Rebecca Rowland, and Bonnie Persons, wife of the deceased William Persons.
>
> The engine of the Plymouth station wagon driven by defendants eventually seized, and the vehicle stopped near Red Bluff, California. All four occupants of the vehicle were taken into custody at that time. The station wagon was identified as the vehicle last used by William Persons before his shooting death.

(*Altamirano v. Morgan*, Case No. C98-1234R, Dkt. No. 21, Report and Recommendation issued February 4, 1999).

Petitioner and his brother were subsequently charged in Snohomish County Superior Court with first-degree robbery and first-degree burglary under Cause No. 82-1-00633-0 and first-degree murder and second-degree theft under Cause No. 83-1-00023-2. On March 16, 1983, the jury returned a verdict of guilty on all charges. The jury also returned a verdict finding that petitioner and his brother were armed with a deadly weapon during the commission of the robbery, the burglary, and the murder. On May 10, 1983, petitioner was sentenced to a maximum term of 40 years imprisonment as to the robbery and burglary charges and to a maximum term of life imprisonment as to the murder charge. The sentencing court directed that these two terms run consecutively. (Dkt. No. 25, Ex. 1 at 3).

Following imposition of sentence, petitioner filed a direct appeal of his convictions to the Court of Appeals of Washington, Division I. *See State v. Altamirano*, 38 Wn. App. 409 (1984). On August 1, 1984, the Court of Appeals issued an opinion affirming petitioner's convictions. *Id.*

Because petitioner was sentenced prior to the effective date of the Sentence Reform Act,

REPORT & RECOMMENDATION
PAGE 4

1  RCW 9.94A.905, the Board was responsible for setting petitioner's minimum sentence.  On

2  October 17, 1983, the Board set petitioner's minimum terms on all counts except for the murder

3  count over which the Board had no jurisdiction at that time.

4        On July 21, 1988, the Board reviewed petitioner's case, in light of the Washington

5  Supreme Court's decision in *In re Irwin*, 100 Wn.2d 175 (1988), to determine whether

6  petitioner's terms of confinement should continue to run consecutively as directed by the

7  sentencing court or whether it should direct the minimum terms to run concurrently.  (Case No.

8  C98-1234R, Dkt. No. 11, Ex. 13).  The Board determined at that time that the sentence imposed

9  upon petitioner in Case No. 83-1-00023-0 should run concurrent to the sentence imposed in

10 Cause No. 82-1-00633-0.  (*Id*.)  On October 25, 1988, the Board rescinded its action of July 21,

11 1988.  (*Id*., Ex. 14).  The Board explained that, when it set petitioner's sentences to run

12 concurrently, it had done so based upon the erroneous belief that the conduct underlying the two

13 sets of charges was the same.  The Board thus reinstated the consecutive sentences.  (*Id*.)

14       On February 12, 1991, the Board set petitioner's minimum sentence for the murder

15 conviction at 410 months. (Dkt. No. 25, Ex. 4 at 2).  The Board noted that the sentencing range

16 contemplated by the Sentencing Reform Act was 306-410 months.  (*Id*.)  In November of 1991,

17 the Board paroled petitioner from his robbery conviction, *nunc pro tunc* to February 17, 1988.

18 (Case No. C98-1234R, Dkt. No. 11, Ex. 17).  Accordingly, petitioner began serving his 410-

19 month sentence for the murder conviction on February 17, 1988.

20       In 1997, the Washington Court of Appeals concluded that the Board had

21 mischaracterized an out-of-state conviction in calculating petitioner's offender score on the

22 murder count and remanded the matter back to the Board for recalculation of the offender score

23 and minimum term of confinement on that count.  (*Id*., Ex. 24 at 5-6).  The Board subsequently

24 recalculated petitioner's offender score and reduced his minimum term of confinement to 382

25 months on the first degree murder charge.  (*Id*., Exs. 27-28).  In 2005, the Board again reviewed

26 petitioner's sentence and adjusted it downward to 368 months, which the Board determined was

1  the high end of the possible range under the Sentencing Reform Act. (Dkt. No. 32 at 3-4).

2  In July of 2006, petitioner appeared before two members of the Board for a parole
3  hearing pursuant to RCW 9.95.100.[1]  (Dkt. No. 25, Ex. 6).  Petitioner was represented by
4  counsel and an official from the Washington Department of Corrections also appeared.  The
5  official testified that petitioner had had no infractions since 1996, that he had completed victim
6  awareness and anger management classes, had worked steadily while incarcerated, had
7  managed to save over $1,500, and that, overall, "he is a pleasure to work with."  (Dkt. No. 29,
8  Ex. 1 at 2-3).  The official also noted that at the end of petitioner's prison term, he would likely
9  be deported by the federal government to Mexico because of his status as an illegal alien.  (*Id*.
10 at 5).

11  The Board members had been given documents in support of petitioner's request for
12  parole, including a psychological evaluation of petitioner written by Dr. Mark Duris, Ph.D.
13  (Dkt. No. 32, Ex. A).  This evaluation stated that petitioner had completed his GED through a
14  community college, had taken further classes, and spent his free time attending church, reading
15  and exercising.  (*Id*. at 4-5).  Dr. Duris concluded that petitioner's "potential for actual violent
16  recidivism is very low," and commented that petitioner's "criminal activity seems to be
17  restricted to the events surrounding his offense."  (*Id*. at 8-9).

---

[1] This statute provides as follows:

> Any person convicted of a felony committed before July 1, 1984, and undergoing sentence in a state correctional institution, not sooner released under the provisions of this chapter, shall, in accordance with the provisions of law, be discharged from custody on serving the maximum punishment provided by law for the offense of which such person was convicted, or the maximum term fixed by the court where the law does not provide for a maximum term. **The board shall not, however, until his or her maximum term expires, release a prisoner, unless in its opinion his or her rehabilitation has been complete and he or she is a fit subject for release**.

RCW 9.95.100 (emphasis added).

At the hearing, the two Board members expressed concern about the underlying crimes. As Board member Julia Garratt commented: "I guess the question is, number one, why would we ever want to take a chance on releasing you at this time, knowing what you did last time you were in the community, and being we want to talk to you about the underlying facts of this, these crimes." (*Id*. at 6). Ms. Garratt then asked petitioner "[w]hy were you involved in those things?" (*Id*.) Petitioner replied, "Okay we got money and the money finished. We was looking for job we no find job." (*Id*.) During the questioning that followed, petitioner at various points stated that he was "remorseful," that he "accept[ed] responsibility for the things that happened," that "I'm the one who committed those crimes and I feel bad for those people" and "I make a bad decision." (*Id*. at 6-7).

The other Board member, Dennis Thaut, also expressed concern about the underlying crime: "It can't get any worse than that in terms of just the absolute unnecessary level of violence and disregard for human life and your inability to let your feelings might be in part language issues but describing it as a mistake is maybe you're having the same difficulty in trying to explain it as I'm as a board member trying to get my arms around this level of violence . . . . I have to tell you that this is a tough one given the level of criminal behavior you engaged in . . . ." (*Id*. at 7).

On August 7, 2006, the Board issued its decision, denying petitioner parole and increasing his minimum term from 386 to 476 months. (Dkt. No. 25, Ex. 6 at 1). Although the Board acknowledged that petitioner had a good record while incarcerated and was remorseful for his conduct, the Board stated that petitioner had "difficulty discussing the current offense" and "was unable to articulate any other feelings or causes for such a senseless, horrific series of crimes." (*Id.* at 3). The Board concluded that it remained "concerned about the horrific and senseless nature of the murder as well as the crime extensive spree surrounding it." (*Id*.).

On December 18, 2006, petitioner filed a personal restraint petition ("PRP") in state court, challenging the Board's decision. (Dkt. No. 25, Ex. 7). In particular, petitioner

REPORT & RECOMMENDATION
PAGE 7

contended that the Board "abused its discretion in ignoring favorable evidence from psychological evaluations and institutional counsel [sic] recommendation . . . ." (*Id*. at 17). One month later, petitioner filed a motion to supplement his PRP, adding a claim that the Board had violated his due process and equal protection rights by, in effect, failing to take into account his alien status and imposing requirements that were impossible for him to satisfy. (*Id*., Ex. 8 at 2-3).

On June 26, 2007, the Washington Supreme Court Commissioner dismissed the PRP. (*Id*., Ex. 11). The Commissioner disagreed with petitioner's contention that the Board had abused its discretion by ignoring his positive psychological evaluations, and stated that the Board had "expressly considered the evaluation." (*Id*. at 5). Furthermore, the Commissioner found that the Board had also been "mindful of the heinous nature of the murder and the extensive crime spree surrounding it, and of [petitioner's] continued failure to view the murder as any more than 'an accident,' 'a bad decision,' and 'a mistake.'" (*Id*.) On this record, the Commissioner found that petitioner had not met his burden of showing that the Board had abused its discretion. (*Id*.)

On July 16, 2007, petitioner filed a motion to modify the Commissioner's ruling. (*Id*., Ex. 12). In his motion to modify, petitioner argued that the Commissioner "erroneously ruled that the [Board] did not abuse its discretion or denied [petitioner's] due process and equal protection constitutional rights under the State and Federal Constitution when the Board . . . [imposed] an additional 90 month sentence." (*Id*. at 2). The Washington Supreme Court denied petitioner's motion to modify on September 5, 2007. (Dkt. No. 25, Ex. 13).

On December 4, 2007, petitioner filed the instant petition for a writ of habeas corpus under 28 U.S.C. § 2254. (Dkt. No. 4). The Court referred the matter to the Federal Public Defender ("FPD") for its consideration as to whether appointment of counsel was warranted. (Dkt. No. 5). The FPD then filed a notice of its intent to seek appointment. (Dkt. No. 7). The Court appointed FPD to represent petitioner and granted FPD leave to file an amended habeas

petition. (Dkt. No. 10). After receiving an extension of time, FPD filed an amended petition on March 31, 2008. (Dkt. No. 15). Respondent filed an answer on July 9, 2008, arguing that petitioner's sole ground for relief was unexhausted and procedurally barred. (Dkt. No. 22). Petitioner filed a response to the answer. (Dkt. No. 26).

Because respondent's answer had addressed only the exhaustion issue, the Court directed respondent to file a supplemental brief addressing the merits of petitioner's claim. (Dkt. No. 28). Respondent did so on October 14, 2008. (Dkt. No. 29). Petitioner filed a response to the supplemental answer on November 11, 2008. (Dkt. No. 32). Respondent has not filed a reply and the matter is now ready for review.

## GROUND FOR RELIEF

Petitioner sets forth the following ground for relief in his habeas petition:[2]

> [Petitioner's] Fifth and Fourteenth Amendment rights to due process and equal protection were violated when on August 7, 2006, the Board determined that [petitioner] was not parolable and added 90 months to his minimum term.

(Dkt. No. 15 at 7).

## DISCUSSION

Respondent argues first that petitioner failed to exhaust his claim in state court and that the claim is now procedurally barred. Respondent next argues that even if the claim is not barred, under Washington's parole system and Supreme Court precedent, petitioner has no protected right to due process. Finally, respondent argues that even if petitioner has a right to due process, the Board's August 7, 2006 decision did not violate that right. The Court will address the first two arguments but need not reach the third as the Court concludes that petitioner

---

[2] Petitioner appears to raise a second claim in his response to respondent's supplemental answer, in which he argues that the Board impermissibly "continu[ed] to raise Mr. Altamirano's minimum sentence beyond SRA range based on the same factors." (Dkt. No. 32 at 17). However, the Court will not address a claim raised for the first time in a response. In addition, it appears that petitioner's argument is based on Washington law and is not cognizable on habeas review.

has failed to show that he has a right to due process under the Washington parole statute.

## Exhaustion

In order to present a claim to a federal court for review in a habeas corpus petition, a petitioner must first have presented that claim to the state court. *See* 28 U.S.C. § 2254(b)(1). The exhaustion requirement has long been recognized as "one of the pillars of federal habeas corpus jurisprudence." *Calderon v. United States Dist. Ct. (Taylor)*, 134 F.3d 981, 984 (9th Cir.) (citations omitted), *cert. denied*, 525 U.S. 920 (1998). Underlying the exhaustion requirement is the principle that, as a matter of comity, state courts must be afforded "the first opportunity to remedy a constitutional violation." *Sweet v. Cupp*, 640 F.2d 233, 236 (9th Cir. 1981).

A petitioner must not only present the state court with the *first* opportunity to remedy a constitutional violation, but a petitioner must also afford the state courts a *fair* opportunity. *Picard v. Connor*, 404 U.S. 270 (1971); *Anderson v. Harless*, 459 U.S. 4 (1982). It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state law claim was made. *Harless*, 459 U.S. at 6. "[A] claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle the petitioner to relief." *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996).

Here, respondent argues that petitioner failed to exhaust his claim because he failed to present it in his PRP or in his motion to supplement the PRP. Regarding the PRP, respondent argues that although petitioner raised a due process claim, he relied upon a different set of facts than those presented in his federal habeas petition. (Dkt. No. 22 at 7-8, 14). The Court agrees with respondent on this point. However, that does not end the inquiry. After the Commissioner dismissed petitioner's PRP, petitioner filed a motion to modify the Commissioner's ruling. In the motion to modify, petitioner repeated his due process claim, but this time relied upon the same facts as he presents here. (Dkt. No. 25, Ex. 12 at 2).

Respondent concedes that this is so, but argues that nonetheless, petitioner's claim is

unexhausted because by presenting the claim in a motion to modify, petitioner presented the claim in a "procedural context in which the merits will not be considered unless there are special and important reasons therefor." (Dkt. No. 27 at 3, *citing Castille v. Peoples*, 489 U.S. 346, 351 (1989) (internal quotes omitted)). Respondent contends that petitioner failed to satisfy the exhaustion requirement because raising a claim for the first time in a motion to modify is insufficient to "alert the [state] court that a decision on the merits of a new claim was required . . . ." (Dkt. No. 27 at 4).

Petitioner argues in response that presenting a claim for the first time in a motion to modify satisfies the exhaustion requirement because under Washington law, a motion to modify a commissioner's ruling is entitled, as a matter of right, to *de novo* review by a three-judge panel of the Washington Supreme Court. (Dkt. No. 26 at 5, *citing State v. Rolax*, 702 P.2d 1185, 1187 (Wash. 1985)). Petitioner maintains that by triggering *de novo* review, and thereby affording the state court an opportunity to consider his claim, a motion to modify complies with the requirement that claims be "fairly presented" to state courts.

The Court finds this to be a close question. It cannot be denied that raising a claim in a PRP is a clearer method of satisfying the exhaustion requirement than raising it in a motion to modify a commissioner's ruling. However, given the *de novo* review to which a motion to modify is entitled, it also cannot be said that such a motion lies in a "procedural context in which the merits will not be considered unless there are **special and important reasons** therefor." *Castille v. Peoples*, 489 U.S. at 351 (emphasis added). The Washington rule of appellate procedure that governs motions to modify does not require a party to do anything more to gain *de novo* review than to file and serve a copy of the motion within 30 days after issuance of the ruling being challenged. *See* Wash. RAP 17.7. The rule does not require a party to cite "special and important reasons" in order to obtain review. Indeed, in *Rolax*, the Supreme Court of Washington relied upon the existence of the motion to modify as proof that commissioners do not have the same authority as appellate judges, and commented that "a party who does not like

REPORT & RECOMMENDATION
PAGE 11

the commissioner's ruling is not forced to accept it." 104 Wash. 2d at 133.

For the foregoing reasons, the Court finds that petitioner fairly presented his federal habeas claim to the state court by way of his motion to modify and that he thereby satisfied the exhaustion requirement. Next, the Court turns to whether petitioner had a federally-protected right to due process when the Board denied him parole and extended his minimum sentence on August 7, 2006.

Right to Due Process

In *Greenholtz v. Inmates of Nebraska Penal & Correctional Complex*, 442 U.S. 1 (1979), the Supreme Court addressed the constitutional underpinnings of parole and held that "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Id.* at 7. However, the Court also held that if a state establishes a system that creates a legitimate expectation of parole, then such an "expectancy of release . . . is entitled to some measure of constitutional protection." *Greenholtz*, 442 U.S. at 12. To determine whether a state has created a legitimate expectation of parole, a court must examine "the structure and language of the statute [governing parole], as well as the state court's interpretation of the scope of the interest." *Bergen v. Spaulding*, 881 F.2d 719, 721 (9th Cir. 1989) (*citing Greenholtz*, 442 U.S. at 12).[3]

The Nebraska statute at issue in *Greenholtz* provides: "Whenever the Board of Parole considers the release of a committed offender who is eligible for parole, it **shall** order his release **unless** it is of the opinion that his release should be deferred . . . ." 442 U.S. at 11. The statute then lists several reasons for which release may be deferred, including, for example, "[t]here is a substantial risk that [the inmate] will not conform to the conditions of parole." *Id.*. Thus,

---

[3] The Court notes that the Supreme Court has articulated a different test to determine whether a restriction imposed on an inmate while incarcerated implicates a protected liberty interest. Under *Sandin v. Connor*, 115 S. Ct. 2293, 2300 (1995), a court must look to the particular restriction imposed and ask whether it "present[s] the type of atypical, significant deprivation in which a state might conceivably create a liberty interest." *Id.*

REPORT & RECOMMENDATION
PAGE 12

through the use of the mandatory word "shall," the Nebraska statute creates a presumption of release if certain conditions were met. *See Bergen*, 881 F.2d at 721 ("Significant to the determination of whether parole or other early release statutes create such a protectable liberty interest is their use of mandatory language, including use of the commanding term 'shall'."). After examining the structure and language of the Nebraska parole statute, the *Greenholtz* Court held that the mandatory language established a presumption that offenders would be released on parole and thus created a limited liberty interest. *Id.* at 12.

By contrast, the Washington statute that authorizes the Board to grant parole, RCW 9.95.100, differs markedly from the Nebraska statute. The Washington statute provides that the Board "**shall not** . . . release a prisoner, unless in its opinion his or her rehabilitation has been complete and he or she is a fit subject for release." RCW 9.95.100 (emphasis added). Thus, the Washington statute reverses the presumption established by the Nebraska statute and prohibits the Board from granting parole unless it makes the determination specified by the statute. This difference weighs heavily in favor of finding that the Washington statute does not create a protectable liberty interest.

In addition to the difference between the two statutes, Washington courts have held that the parole statute does not create a liberty interest protected by the Due Process Clause. In *In Re Cashaw*, 123 Wash. 2d 138 (1994), the Washington Supreme Court examined whether certain procedural regulations governing parolability hearings create a liberty interest. The regulations require the Board, when conducting parolability hearings, to provide notice and an opportunity to be heard to the inmate under consideration. *See Cashaw*, 123 Wash. 2d at 145, *citing* WAC 381-60-070 and -120. The court held that the regulations did not create a protectable liberty interest. *Id.* at 147. This decision by the Washington Supreme Court provides a definitive interpretation of Washington state law that is binding on federal courts. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983).

Petitioner attempts to sidestep the holding of *Cashaw* by arguing that *Cashaw* is limited

REPORT & RECOMMENDATION
PAGE 13

to the narrow question of "whether the strictly procedural regulations adopted to assist the functioning of the [Board] created a liberty interest." (Dkt. No. 32 at 10). Petitioner maintains that to read *Cashaw* more broadly would be inconsistent with other Washington cases and with principles set forth by the Supreme Court. (*Id*. at 11). I disagree.

First, petitioner contends that other Washington cases, such as *In re Ayers*, 105 Wash. 2d 161 (1986), hold that a liberty interest is created by the statutes, regulations, and procedures that guide the Board's discretion. (Dkt. No. 32 at 10, n.2). While the *Ayers* opinion could be read to so hold, the Washington Supreme Court in *Cashaw* explicitly rejected a reading of *Ayers* that found a protected liberty interest, and instead explained that *Ayers* "merely [held] that the Board must follow its own regulations . . . ." 123 Wash. 2d at 145, n.2. Thus, to the extent that *Ayers* could have been read to support petitioner's argument, that possibility no longer exists after the court clarified its meaning in *Cashaw*.

Second, petitioner argues that reading *Cashaw* to preclude a liberty interest in parole determinations would conflict with the general principle set forth by the Supreme Court that a liberty interest is created when a State places "substantive limitations on official discretion." (Dkt. No. 32 at 11, *quoting Olim v. Wakinekona*, 461 U.S. 238, 249 (1983)). Petitioner maintains that in Washington, limits have been placed on the Board's discretion by various statutes, regulations, and judicial decisions. (Dkt. No. 32 at 11-14). While petitioner is correct that certain statutes and regulations limit the Board's discretion, merely limiting the Board's discretion is insufficient to create a liberty interest. "The adoption of guidelines to structure the exercise of discretion does not necessarily create a liberty interest." *Toussaint v. McCarthy*, 801 F.2d 1080, 1094 (9th Cir. 1986) (citations omitted). The existence of limits on the Board's discretion does not overcome the actual language of the parole statute, which does not create a presumption of release, nor the definitive interpretation of that statute by the Washington Supreme Court, which explicitly rejects the creation of a liberty interest.

Therefore, the Court concludes that petitioner has not shown that he has a protectable

REPORT & RECOMMENDATION
PAGE 14

liberty interest in parole. Consequently, because he has no liberty interest to which due process rights would attach, he cannot show that his due process rights were violated when the Board denied him parole. For this reason, petitioner's habeas petition should be denied.

Although the above analysis ends the Court's consideration of petitioner's claim, the Court feels compelled by the unusual facts of this case to add a further comment: The wisdom of continuing to incarcerate an inmate who has shown such remarkable progress during his 25 years behind bars is not self-evident. Petitioner's continued incarceration undermines the principle of rehabilitation that is supposedly one of the objectives of his incarceration, and begs the question, what more must he show? The transcript of petitioner's parole hearing reveals that the Board essentially denied him parole because of the truly heinous nature of the crimes he had committed a quarter century earlier, and not because of anything petitioner has done while incarcerated. The Court does not minimize the tragic loss of life caused by petitioner's callous acts. However, petitioner can do nothing to change the facts of his underlying crimes. Had petitioner been able to show that he had due process rights under the Washington parole statute, the Court would have found that those rights were violated by the Board's sole reliance in denying parole on the immutable facts of his underlying crimes. *See Irons v. Carey*, 505 F.3d 846, 851 (9th Cir. 2007).[4]

## CONCLUSION

For the foregoing reasons, petitioner's petition for a writ of habeas corpus should be denied with prejudice. A proposed Order reflecting this recommendation is attached.

DATED this 21st day of January, 2009.

JAMES P. DONOHUE
United States Magistrate Judge

---

[4] The Court recognizes that the standard for determining whether a parole decision violates due process may change when the Ninth Circuit issues its *en banc* decision in *Hayward v. Marshall*, 527 F.3d 797 (9th Cir. 2008).